## POWERS *v.* McKENZIE.

### (*Jackson.* April 23, 1891.)

1. SUPREME COURT. *Assignments of error must be specific.*

Assignments of error must state not only the action of the Court complained of, but why it is erroneous. (See Rule 20, 89 Tenn., 774, 775.)

2. SAME. *Exceptions to evidence must be specific.*

General exception to the admission of evidence, made on the trial below, will not be noticed in this Court.

3. SAME. *Immaterial error.*

If entirely satisfied with the verdict, this Court will not reverse for erroneous admission of incompetent evidence, if it clearly appears that such evidence did not affect the result reached.

4. CONSTITUTIONAL LAW. *Title and subject of statutes.*

A statute, having but one subject, and that subject expressed in the title, is not unconstitutional because the title is broader and more comprehensive than the provisions of the Act.

Constitution construed: Art. II., Sec. 17.

Act construed: Acts 1889, Ch. 22.

5. EVIDENCE. *Proof of handwriting.*

Genuineness of a deed being the matter in controversy, other writings or signatures of the maker and witnesses deemed genuine by the Court may be admitted under Act of 1889, Ch. 22, though otherwise irrelevant, for comparison with the disputed instrument by the expert witnesses, and to be considered with the opinions of such witnesses as evidence in the cause.

Act construed: Acts 1889, Ch. 22.

Case cited and approved: Franklin *v.* Franklin, *ante, p.* 44.

6. SAME. *Same.*

But the writings or signatures of a person other than the makers and

witnesses named in the disputed instrument are not admissible solely for comparison by experts under said statute.

Acts construed: Acts 1889, Ch. 22.

7. SAME. *Admissibility of, a question for the Court. Example.*

Admissibility of evidence is always a question for the Court. Therefore the legitimate province of the jury is not trenched upon by the provision in said Act authorizing the Court to decide as to genuineness of writings or signatures offered in evidence.

8. SAME. *Expert witnesses.*

The determination of the trial Judge that a witness is qualified to testify as an expert is entitled to great weight, and will not be reversed unless it is clearly erroneous and attended with injury to the party.

9. SAME. *Same.*

The trial Judge has large discretion in regulating conduct of the trial. There is no abuse of that discretion demanding reversal in the action of the Court limiting each party to five expert witnesses, upon the facts of this case.

10. NON EST FACTUM. *Plea of not essential, when.*

Suit in equity to enforce a trust in land evidenced by written contract. There was no specific denial of the genuineness of the written contract by formal plea of *non est factum*, but the defense made by answer was that the contract was a forgery.

*Held:* That the written contract was not the *foundation* of the suit in such sense as to require plea of *non est factum* to present the issue as to its forgery.

*Question reserved:* Is denial by plea of *non est factum* essential in equity, even as to instrument that is *foundation* of suit?

---

FROM CARROLL.

---

Appeal from Chancery Court of Carroll County. A. G. HAWKINS, Ch.

B. F. LILLARD, Jò R. HAWKINS, ALONZO HAWKINS, and ALVIN HAWKINS for Powers.

Powers *v.* McKenzie.

H. C. TOWNS, W. W. MURRAY, and S. W. HAWKINS for McKenzie.

S. F. WILSON,* Sp. J.   The bill in this cause was filed in the Chancery Court of Carroll County, Tenn., in March, 1889, by John B. Powers and wife, Siletha J. Powers, residents of the State of Texas, to recover from defendants a tract of land containing 212 acres, embracing a portion of the town of McKenzie and its suburbs, or all of said tract not sold to innocent purchasers; to reach other lands possessed by certain of the defendants, bought with the proceeds realized from sales of parts and parcels of said tract, and to make certain of the defendants account for rents and profits derived therefrom.

The predicate of the bill is the right of Siletha J. Powers to recover, upon the facts alleged therein, as the only surviving child and heir at law of A. A. McKenzie, deceased.

There was a demurrer filed by defendants, interposing the defense of the statute of limitations and the staleness of the claim, evidenced by its origin as presented by the facts alleged in the bill.

The demurrer was overruled, and the defendants answered directly, denying all the material facts stated in the complaint.

Upon motion granted, the Chancellor submitted

---

* Hon. S. F. Wilson was appointed by the Governor to sit during temporary illness of Chief Justice Turney.

the cause to the determination of· a jury, úpon three issues. Its trial consumed . nearly a month, and resulted in a finding by the jury of one of the issues in favor of the complainants, and two for the defendants.

Thereupon the Chancellor dismissed the bill, and, the complainants appealed to this Court.

The record here, in connection with what may be designated the bill of exceptions, is in four volumes, and they are all somewhat voluminous. ·

The matter contained in them, relevant and. irrelevant, admitted and rejected, by the Court below, is "dumped," in its ·original form and variety, without any sort of reference to the law of orderly consecution, or to fitness of place. In consequence, the proper classification of the numerous evidential facts· and circumstances, and the various rulings of the lower Court thereon, and their resolution into a legal conclusion determinative of the just rights of the parties, have imposed an unnecessary tax of time and labor upon this Court, that, as the profession know, in order to the proper dispatch and disposal of the numerous cases before it, need, in addition to the assistance of able and candid counsel, clear, orderly, and consecutive records of causes.

The controverted facts surrounding and involved in this controversy, as is manifest from the record, have developed much feeling among the branches of the original McKenzie family. Every thing has been contested, and charges and counter charges, either directly or indirectly, appear at every turn.

This feeling, at least to some extent, entered the mind of counsel; and, as the result of this, in part, perhaps, the pursuit of witnesses in their cross-examinations, and the objections to questions put and answers thereto, exhibit intensity and extension.

The essential facts controlling the rights of the parties, as reasonably established in the record, are these: The defendants, aside from husbands of daughters, claim the lands in dispute as heirs at law of James M. McKenzie, who died in 1873. His title was founded upon a general warranty deed of his brother, A. A. McKenzie, executed July 1, 1837, and put of record in 1839, and his possession and use thereunder until his death.

A. A. McKenzie, then a resident of Texas, died in 1850. This daughter, and only surviving heir at law—the complainant, Siletha J. Powers—while admitting the execution and genuineness of the deed of July 1, 1837, from her father to his brother, James M. McKenzie, insists that, under a contemporaneous agreement made by the brothers and their father and mother, John and Martha McKenzie, a specified trust accompanied and constituted a part of the deed.

The alleged trust was that James M. McKenzie took the legal title to the lands in controversy in trust, and held it for the use and benefit of and for a home for his father and mother during their joint and several lives; and upon the death of the survivor of them, he was to reconvey the

lands to his brother, A. A. McKenzie, if living, and if dead, to his heirs at law.

In support of the trust, she presents with the bill a written instrument, of even date with the deed of her father to James M. McKenzie, embracing its terms, signed by James M., John, and Martha McKenzie, and witnessed by Samuel Winn, Sarah Winn, Jerry McKenzie, and J. W. Hamill —the last-named being the alleged draughtsman of the body of the instrument.

It is asserted that this instrument, witnessed as just stated, exhibited with the bill, is the actual paper executed by James M. McKenzie to preserve the evidence of the trust, or that it is a true copy of the one that was actually executed by him. It is obvious, however, from the evidence in this record introduced by the complainant herself, that her rights, if any exist growing out of the trust, must stand or fall upon the fact that the instrument is the original and not a copy; for there is no evidence of material weight or directness that it is a copy.

In further statement of her relation to the terms of the trust, it is insisted by Mrs. Powers that John McKenzie, the father of James M. and A. A. McKenzie, died many years since; that Martha, their mother, died in 1851; that her father, A. A. McKenzie, died in 1850; that she married when a minor, before the death of her father and grandmother, Martha; that she has since been a *feme covert;* and that, through the fraud and con-

cealment of facts by James M. McKenzie and her failure to discover the existence of the trust instrument witnessed as before stated, and exhibited with her bill, until after the death of her mother in March, 1885, she was unaware of her rights and the written evidence sustaining them, and hence no suit to establish the same was sooner instituted.

Predicating her claim practically and substantially upon the direct terms and validity of this written instrument alleged to have been executed by James M. McKenzie and witnessed by the parties stated, all of whom died years since, it is obvious that defendants, failing to put complainant out of Court by their demurrer, had either to surrender or successfully assail the genuineness of the trust instrument, and maintain that no such trust as is indicated by its terms was ever in fact entered into by James M. McKenzie.

Five issues were presented by complainants to the Chancellor for submission to the jury. He submitted three of them.

The first averred, in substance, that the deed of A. A. McKenzie to James M. McKenzie, of date of July 1, 1837, was executed in consideration of the latter holding the land described and the legal title thereto in trust for the use and benefit of his father and mother during their joint and several lives; and, upon their death, to reconvey it to A. A. McKenzie if living, and if dead, to his heirs at law.

The second avers that Martha McKenzie, the

mother of A. A. and James M. McKenzie, died after the death of her son, A. A. McKenzie.

The third avers that James M. McKenzie held the land in controversy and the legal title thereto, from the death of his mother till his death, in trust for the use and benefit of the heirs at law of A. A. McKenzie, and that since the death of James M. McKenzie, the defendants have held the land under the same trust.

An immense volume of evidence in depositions, in written matter, and given by witnesses orally, was introduced before the jury trying these issues. Most of it was directed in support of, and assault upon, the witnessed instrument of trust, presented by the complainant as the direct written basis of her claim, and asserted by her to have been executed by James M. McKenzie. It is obvious, therefore, that a large part of it was in reference to the authenticity of the signatures to, and the handwriting of, said 'instrument, and of the old written matter brought forward to uphold or destroy it.

The first and third issues were found by the jury in favor of the defendants, and the second for complainants; and, as stated, the bill was dismissed by the Chancellor, and the case is here by appeal of complainants.

The assignment of errors, as *filed* by complainants, is not in conformity to the rules of this Court regulating the matter, and hence, strictly speaking, should not be considered. It is pre-

sumed, however, that learned counsel of complain-
ants supposed their printed brief was to be taken
and considered a part of the assignment of errors.
But no such brief is filed in connection with the
*filed* errors assigned, and asked to be considered
as a part thereof.

The filed assignment of errors, setting out forty-
four errors, of itself furnishes the Court no sort
of idea as to what issues or questions are in-
volved, and the errors assigned, in and of them-
selves, have no intelligible relevancy to any distinct
issue raised in the pleadings.

The assignment of errors is printed, and one of
these printed assignments, but not the one filed
with the record, has a printed brief attached to
it; and if we can consider the printed brief as a
part of the assignment of errors, it brings the
latter much nearer to a satisfactory compliance
with the rules governing the subject.

In view of the condition of the record of this
cause in this Court, and the consent of the Court
before it was taken up for argument that the
record as it is would be accepted and treated as
a paper, one upon which to adjudicate the rights
of the parties, we will also consider the printed
brief of counsel as a part of the assignment of
errors.

As stated, forty-four errors are assigned, and it
is obvious that we cannot separately in this opinion
consider them, and give our reasons for the con-
clusion we have reached in respect to each.

It is sufficient to say that we have carefully read this entire record, and parts of it several times, and have examined each assigned error in the light of the whole record, as well as the special part directly related to each.

Thirty-seven of these assigned errors complain of the action of the Chancellor in respect to the admission or rejection of testimony. Many of them relate to his action sustaining objections of defendants to the reading of questions and answers thereto contained in the numerous depositions read in the trial of the cause.

With respect to all of them, except one, it may be stated that the bill of exceptions accompanying the record, and forming a part of it, fails to specify the grounds of objection, and in nearly all fails to show more than the simple fact that the Chancellor sustained the objection of defendants in regard to certain questions put to witnesses, and their answers thereto. It is well settled that a trial Court cannot be put in error by this Court by such general objections as are exhibited in the record. Moreover, with one or two exceptions, the errors assigned fail to show or present any reason why the action of the Chancellor complained of in them is erroneous. It is not sufficient simply to say, in an assignment of error here, that the Court below did so and so, or failed to do so and so.

One class of errors assigned is predicated upon the action of the Chancellor in permitting a com-

parison of handwriting by experts; and, in this connection, it is insisted that Chapter 22, Acts of 1889, passed February 21 and approved February 26, 1889, is unconstitutional.

It is our duty to pass upon the validity of statutes obnoxious to the Constitution, however called to our attention by litigants in this Court, when their rights are prejudiced by action of lower courts predicated upon their validity. Hence, we will consider the Act in question and the grounds advanced against its constitutionality.

It is settled that Courts, in dealing with the acts of a co-ordinate and independent department of the government under which both act within defined constitutional limits, will not upon refined subtleties and distinctions, nor upon mere speculative reasons, pronounce such acts violative of the organic law. On the contrary, in so far as presumptions are admissible in judicial interpretation, they will presume in favor of the constitutionality of its action. The constitutionality of the Act in question has been assailed mainly upon two grounds.

*First.*—It is argued that the title of the Act is broader and more comprehensive than its provisions.

*Second.*—It is insisted that the Act provides that the Judge shall, as a preliminary question, decide upon the genuineness of the writings offered as a standard of comparison, and that this is an invasion of the province of the jury under the Constitution.

12—6 p

Neither ground is tenable. Article II., Section 17, of the Constitution, among other things, provides that "no bill shall become a law which embraces more than one subject, that subject to be expressed in the title."

We are aware of no adjudicated case, and it is believed that none can be found, that holds an Act of the Legislature obnoxious to this section of the Constitution simply on the ground that the provisions of the Act do not embrace or cover the full scope of appropriate legislation admissible under its title. The intent of this provision of our organic law was to secure, in a legislative sense, unity of subject expressed in its title in each legislative act; and this for the protection of the legislative body as well as its constituency.

The cases, as well as sound reason, in the exposition of this and similar provisions of written constitutions, condemn Acts because their terms and legal import go beyond the scope of their titles, and not because they keep well within them.

As to the second ground of assault upon the Act, it is sufficient to say that, in making it the duty of the Judge, as a preliminary question, to pass upon the genuineness of the writings to be used as a standard of comparison, it is a legislative adaptation to the subject-matter of the settled rule of the common law, that, as a general proposition, it is the province of the Court to say what is evidence in cases and the province of the jury to decide upon its efficacy.

Upon neither of the grounds advanced, nor upon any other so far suggested to the consideration of the Court, is the Act in question amenable to constitutional objection.

Moreover, this Act, treating it *sub silentio* as constitutional, was construed by this Court in the case of *Franklin* v. *Franklin, ante, p.* 44, decided at the recent term at Nashville. In that case, the Court held that the handwriting of the instrument in issue in a case, if the fact of its execution was disputed, might be compared with the genuine writing of its alleged maker, either to prove or disprove its execution by him; but that it could not be compared with the genuine writing of a third party— though the party claiming under it—to show that said third party executed it. This is the extent of the holding in that case.

In this case the alleged instrument presented by complainant, and by which as evidence she sought to establish the trust entitling her to the property in controversy, was signed by James M. McKenzie, his father and mother, and was witnessed by other parties. All these parties, therefore, were parties to its execution, and, as its authenticity was in evidential issue, it was competent for the defendants to show that it was a forgery by witnesses acquainted with the handwriting of the parties to it, who would testify that it was not in their handwrite nor signed by them. It was also admissible for them to show that it was a forgery by experts comparing the writings of the instrument and

the signatures thereto with the genuine writings of
its apparent makers. This is in accord with the
Franklin case. It was also competent for defend-
ants to show, by witnesses acquainted with the
handwrite of Mrs. Powers, that she was the author
of the instrument she presented as the written
evidence of her claim.

It . is insisted, however, by learned counsel for
complainants that the Chancellor permitted experts
to take the alleged trust instrument, and other
documents, and the genuine writings of Mrs. Powers,
and compare them, and from that comparison to
say who wrote the instrument in issue. The bill
of exceptions shows that this was done, and that
it was objected to by complainant, but not upon
the ground, except in one instance, that such a
comparison of hands was inadmissible.

The instance properly raising an objection pred-
icated upon this ground, was in the examination
of witness Baker. It was improper, and in con-
flict with the ruling of this Court in the Franklin
case cited, to permit this witness to compare the
trust instrument in issue with the genuine writings
of Mrs. Powers, and from such comparison give
his opinion as to the author of the trust instru-
ment. If we were in doubt in respect to the
merits of the case having been reached, or could
see that the opinion of this witness might have
affected the finding of the jury on the issues
submitted to them, it would be reversible error.
While a similar comparison was probably made by

one or more other witnesses, judging from this record and the assignment of errors, no objection thereto, based upon the ground of its being in contravention of the rules of evidence as authorized by the Act of the Legislature, was made. So far as we can see from this record, the objection was that the witnesses were not experts, and this objection is assigned as error here.

Who are experts is a question that has somewhat vexed the Courts. The true distinction between an expert and a non-expert witness, says Mr. Wharton, " is that the latter gives the results of a process of reasoning familiar to every-day life, and the former gives the results of a process of reasoning which can be mastered only by special scientists." It is obvious that however an expert may be defined, he should, in order to give his opinion as an expert, have some special as well as practical acquaintance with the immediate line of inquiry. Where the line between an expert and a non-expert should be drawn must, under the varying conditions of cases and their environments, necessarily be laid down by the *judex fori;* and this Court will not reverse on account of the judgment of the lower Court as to whether a witness offered in it is an expert, unless we can clearly see that he was in error in respect to the qualification of the witness, and that his error was injurious.

So far as we can see from this record, the witnesses permitted to speak as experts in this case

were properly qualified to speak in relation to the subject of inquiry upon which they were examined.

It is further assigned as error that the Chancellor erred in limiting the number of experts to each side to five.   Manifestly, a trial Judge must have some control over the dispatch of business in his court, and some discretion respecting the number of witnesses he will hear upon a specific line of inquiry incident to a case.   This conceded, it follows, from the essential nature of the juridical connection of inferior and appellate courts, that the latter will not reverse the ruling of the former, originating in the exercise of this discretion, unless it has been abused and it can be seen that this abuse has resulted in injury.   The value and convincingness of expert testimony in arriving at the truth in this case are not so clear and evident that the Court can see that the Chancellor abused his authority in limiting the number of experts to five on each side.

It is further insisted by complainants that it was error in the Court below to admit any testimony controverting the execution of the trust instrument, because it was a signed written instrument, and constituted the foundation of her suit, and that, therefore, in order to show by evidence that it was not executed by the parties whose names were signed to it, a specific denial of its execution by a plea of *non est factum* was necessary.

It might be unnecessary to decide in this case

whether, in cases of this character, in Courts of Equity, such instruments as the one under review here, and made the *foundation* of suit, must be denied under oath by formal plea of *non est factum* before evidence impeaching their authenticity can be received, because the question is not clearly made in the bill of exceptions. It is sufficient to say, however, first, that, under the bill in this cause, the instrument assailed is not made the *foundation* of the suit, but is brought forward merely as evidence of an asserted trust; and, second, we are clearly of opinion that in this class of cases, in Courts of Equity, no formal plea of *non est factum* is demanded as a precedent condition to the admission of evidence relevant to the issues raised in the pleadings. It is also claimed in the numerous errors assigned that the Chancellor was in fault in respect to various other rulings concerning evidence. We have examined them all, and none of them go to the merits. In fact, it is absolutely and indisputably proved by clear evidence, that can hardly be said to be controverted at all, that the character and description of paper upon which the alleged trust instrument is written, was not manufactured until long subsequent to its date. This fact, with the great volume of additional evidence tending to directly show that the instrument relied upon is a forgery, and demonstrating that it never had the sanction of a legal existence, disinclines the Court to reverse for purely technical errors, which, if corrected and the cause

remanded, would, upon a second trial, result in the same verdict.

It is also insisted that the finding of the jury, upon the issues submitted to them, is not supported by the evidence. The assignment of errors does not pretend that there is no evidence upon which the jury could have based its conclusions. There is no merit in this insistence. The overwhelming weight of the competent evidence is on the side of the verdict. Several errors are presented in respect to portions of the charge of the Chancellor to the jury. A close examination of the whole charge evinces that the law applicable to the issues before the jury, under all the facts in evidence, was given in language and contextual arrangement more favorable than, in certain phases of the facts, complainants had the right to demand.

The right result and the truth, we believe, have been reached in this important case.

The decree of the Chancellor dismissing the bill is affirmed, with costs.